**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0150n.06
Filed: February 23, 2007

**06-5691**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ABDON IBARRA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LEXINGTON-FAYETTE URBAN | ) | EASTERN DISTRICT OF KENTUCKY |
| COUNTY GOVERNMENT; TERESA | ) | |
| ISAAC; and ALAYNE WHITE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

PER CURIAM. The plaintiff, Abdon Ibarra, appeals from two district court rulings that resulted in the dismissal of his amended complaint against the Lexington-Fayette Urban County Government (LFUCG), Mayor Teresa Isaac, and Commissioner Alayne White. In that filing, Ibarra alleged that defendant Isaac slandered him and that all three defendants unconstitutionally retaliated against him for exercising his First Amendment rights of free speech and association. In light of the United States Supreme Court's recent decision in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), we conclude that Ibarra has failed to establish that the speech he highlights was entitled to protection under the First and Fourteenth Amendments to the United States Constitution. It thus becomes unnecessary

to review the propriety of the district court's determination that the plaintiff failed to establish a temporal link between the speech in question and his eventual termination. Moreover, we agree that the district court's rulings on the questions of the alleged infringement of the plaintiff's right of association and the allegation of defamation were correct in all respects and, therefore, affirm those rulings for the reasons given in the district court's memorandum opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts relating to this litigation are not seriously disputed by the parties and were succinctly stated by the district court in its memorandum opinion ruling on the defendants' motion to dismiss Ibarra's amended complaint. In that decision, the district judge summarized:

> Ibarra was employed by the Lexington-Fayette Urban County Government ("LFUCG") as "Coordinator of Immigrant Services" from December 20, 1999, to August 27, 2003. After the election of Mayor Teresa Isaac ("Mayor Isaac" or "Isaac") in November, 2002, Ibarra expressed concerns and complaints relating to the treatment of the local Hispanic community. According to the amended complaint those expressed concerns included, but are not limited to:
>
> 1. In December of 2002, Ibarra told Bruce Edwards, a member of Mayor Isaac's staff, that a non-profit organization partially funded by the LFUCG had a history of racial discrimination.
>
> 2. In January of 2003, Ibarra advised Alayne White, Commissioner of Social Services for the LFUCG, that another non-profit Hispanic organization was requiring cash "kickbacks" from Hispanic laborers who sought assistance from the organization.

3.  In January of 2003, Ibarra told Mayor Isaac that two individuals who wanted to provide Hispanics with "unofficial identification cards" were proposing excessive fees for those cards and that he had been working on a project to provide government sanctioned identification cards at a much lower cost.

4.  In January of 2003, Ibarra advised Council member, Paul Brooks, that Hispanic workers in the Cardinal Valley area were being charged for services represented as free and overcharged for other various services. Ibarra proposed that a Resolution be adopted by the LFUCG Council to help "quell the tide" of overcharges.

5.  In January of 2003, Ibarra drafted a proposed Resolution relating to the abuses and mistreatment of the Hispanic Community.

6.  In February of 2003, during the now infamous ice storm, Ibarra discussed with the *Lexington Herald-Leader* some of the "serious communication problems due to 'English only' public announcements to the local Hispanic community regarding life threatening and dangerous alternative heating sources."

Plaintiff claims that all of these communications were made to public officials and/or the newspaper for public dissemination.

Ibarra claims that, due to these expressions of concern, he was subjected to a pattern of retaliatory conduct by the LFUCG, Mayor Isaac, and Commission Wayne [sic]. For example, Ibarra claims he was removed from projects, told to stop certain investigations, told not to speak on certain subjects, and issued "severe" reprimands. He also claims that a resolution he helped prepare was pulled from the LFUCG Council's agenda. Ibarra's amended complaint states that this retaliatory conduct ultimately concluded with his termination on August 27, 2003.

Following his termination, Ibarra applied for unemployment benefits. The Kentucky Division of Unemployment Insurance conducted a hearing, the result of which was a ruling stating that Ibarra was "discharged for reasons other than misconduct" and an award of unemployment benefits.

Also subsequent to Ibarra's termination, on August 27, 2003, Mayor Isaac conducted an audit of the Cardinal Valley Empowerment Project, a non-profit organization incorporated by Ibarra. The LFUCG also initiated a LFUCG police investigation into Ibarra's financial activities at the Cardinal Valley Center. As explained in correspondence from the LFUCG to Ibarra, attached to the Amended Complaint, the audit and investigation were to wrap up some "loose ends" regarding Ibarra's employment, and close out his relationship

with the LFUCG.  Ibarra cooperated with the audit.  In connection with the audit, Mayor Isaac telephoned Ibarra's wife, Lori Ibarra ("Lori"), and advised her that her husband had set up several bank accounts in her name; that her husband failed to provide requested financial records; and that her husband was in serious trouble.  Ibarra claims that Mayor Isaac's conduct constituted both "outrageous conduct by intentional infliction of emotional distress and slander."

Because Ibarra did not file his original complaint in this matter until August 18, 2004, the district court determined that Kentucky's applicable one-year statute of limitations barred all claims for personal injury alleged in the complaint except for the claim of retaliation relating to the plaintiff's August 27, 2003 termination.  *See* KY. REV. STAT. ANN. § 413.140(1)(a).  Furthermore, the court dismissed Ibarra's claim for intentional infliction of emotional distress because the alleged acts of the defendants did not constitute conduct sufficiently outrageous to justify imposition of tortious liability.  Likewise, the district court dismissed the plaintiff's slander cause of action, concluding that the single telephone call from Isaac to Lori Ibarra did not place the plaintiff "into a position of public hatred, contempt, ridicule; cause him to be shunned or avoided, or injure him in business or occupation."  Finally, the district judge ruled that Ibarra's freedom of association claim must also be dismissed because the "amended complaint makes no factual allegations as to how Ibarra's freedom of association was hindered by acts of Mayor Isaac, Alayne White, or the LFUCG.  Moreover, Plaintiff's amended complaint fails to state with whom he was prevented from associating."

Subsequently, the district court also granted summary judgment in favor of the defendants on the remaining retaliation cause of action. In doing so, the district judge concluded that "[t]he Court need not determine whether Ibarra's speech constituted constitutionally protected speech because he cannot show that his speech was a motivating factor in the defendants' decision to terminate his employment." The court also noted:

> Ibarra has not demonstrated that his protected conduct in January, February, and March of 2003 led to his termination several months later in August of 2003. Furthermore, Ibarra has not presented any evidence that he engaged in any protected conduct after March of 2003 that served as a motivating factor in his dismissal.

Before this court, Ibarra now concedes the propriety of the district court's dismissal of the intentional infliction of emotional distress claim. He continues to assert, however, the viability of the other causes of action asserted in his amended complaint.

## DISCUSSION

As recognized by this court sitting en banc:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). In this case, the parties do not dispute that Ibarra was subjected to an adverse action (termination) that would deter a reasonable individual from engaging in the conduct that prompted the employment decision. The district court, assuming for the sake of argument that Ibarra's speech was constitutionally protected, nevertheless concluded that the relatively innocuous comments made by the plaintiff in January-March 2003 could not be taken as motivation for the termination of Ibarra's employment a full five months later. After the district court's ruling, however, the United States Supreme Court released its opinion in *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), which held explicitly "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. That opinion, obviously, has direct implications for this case.

By now, the legal principle that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern" is beyond legitimate dispute. *See id.* at 1957. This protection exists, moreover, even in some instances in which the expressions are made at the workplace during work hours. *See id.* at 1959. Nevertheless, when an individual acts not as a citizen, but rather merely performs "the tasks he was paid to perform, [he] act[s] as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id.* at 1960.

Ibarra's complaint alleges that his position as "Coordinator of Immigrant Services" required him to undertake the following duties and responsibilities:

> to act as liason [sic] for the LFUCG with the Hispanic community and to promote institutional changes and updates; to improve service delivery to the Hispanic community; to implement educational programs; to achieve cultural competence within the comprehensive service being provided to the community such as health, education, mental health, police services, and all other fields relevant to the improvement and support of the Hispanic community as a whole; to ensure that the Hispanic community made a smooth transition into the educational, social and economic infrastructure of the community as a whole; and to ensure that they affirmatively availed themselves of the rights and protections of the legal and justice system operating within the Commonwealth of Kentucky.

Hence, the plaintiff was, by his own admission, charged with the responsibility of advocating for the Hispanic community with the various governmental agencies and social service providers in the Lexington-Fayette County area. Indeed, as Ibarra himself conceded in his amended complaint, the comments he made that he now alleges were the catalyst for the adverse employment decision concerned "problems, dangers, abuses and/or mistreatment of the Hispanic community" and "were made, in large part, in response to inquiries by public officials, including, but not exclusively, Mayor Teresa Isaac, members of the Mayoral staff, various LFUCG Council members, and the newspaper, the Lexington Herald Leader." Consequently, the comments made by the plaintiff constituted no more than a part of the performance of the tasks that he was hired and paid to complete. The restriction by the defendants of such "speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might

have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 126 S.Ct. at 1960.

The speech that the plaintiff emphasizes to support his allegation of a constitutional violation was, therefore, not constitutionally-protected speech, given the context in which the comments were made. Because Ibarra thus failed to establish the first element of his retaliation claim, we need not engage in an analysis of whether that speech was a motivating factor in the decision to terminate the plaintiff's employment. The district court's rejection of the retaliation claim was thus proper, as were the rulings on the other claims brought by the plaintiff.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court granting summary judgment to the defendants and dismissing the complaint in this case.